

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## EASTERN DIVISION

| | | |
|---|---|---|
| MICHAEL BOLT, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No.: 1:16-cv-00447-SGC |
| | ) | |
| FORD MOTOR COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION[1]

This is a products liability action brought by Michael Bolt against Ford Motor Company. It is before the undersigned on Ford's (1) motion to exclude the expert opinions of Russell Dunn, Ph.D. (Doc. 40), (2) motion to exclude the expert opinion of Charlie Miller (Doc. 42), (3) motions to exclude the expert opinions of Andrew Webb (Docs. 44 & 45), (4) and motion for summary judgment (Doc. 46). For the reasons discussed below, Ford's (1) motion to exclude the expert opinions of Dr. Dunn is due to be granted in part and denied in part as moot, (2) motion to exclude the expert opinion of Miller is due to be granted, (3) motions to exclude the expert opinions of Webb are due to be denied as moot, and (4) motion for summary judgment is due to be granted.

---

[1] The parties have consented to the exercise of dispositive jurisdiction by a magistrate judge pursuant to 28 U.S.C. § 636(c). (Doc. 7).

## I. Background & Facts[2]

As Bolt approached the top of Henry Road in Anniston, Alabama on March 29, 2014, his 2002 Ford Taurus began to accelerate even though he had released the accelerator pedal. (Doc. 48-2 at 47). He slammed the brakes, but they did not respond, and he lost control of the vehicle. (*Id.*; Doc. 48-17 at 4). The vehicle struck a tree, and Bolt sustained brain, pelvic, and lower limb injuries. (Doc. 48-1 at 3; Doc. 48-17 at 7).

Bolt attributes the sudden, unintended acceleration of his vehicle and the resulting crash to an alleged defect in the design of the vehicle's speed control cable retention collar. (Doc. 1 at 5; Doc. 51 at 2).[3] Based on this alleged defect, he commenced this action, asserting a claim against Ford under the Alabama Extended Manufacturer's Liability Doctrine (the "AEMLD"), as well as claims for negligence, negligent failure to warn, wantonness, wanton failure to warn, and breach of implied warranty under Alabama law. (Doc. 1 at 3-18).[4]

Bolt designated Dr. Dunn, Miller, and Webb as expert witnesses to support his claims. Ford seeks to exclude the expert opinions of Dr. Dunn, Miller, and Webb as unreliable and irrelevant (Docs. 40, 42, 44-45) and moves for summary

---

[2] The following facts are undisputed, unless otherwise noted. They are viewed in the light most favorable to Bolt, as the non-movant, with Bolt given the benefit of all reasonable inferences.

[3] In his response to Ford's motion for summary judgment, Bolt clarifies he does not claim the speed control cable retention collar had a manufacturing defect. (Doc. 51 at 13 n.8).

[4] Federal subject matter jurisdiction is premised on diversity of citizenship. (Doc. 1 at 1).

judgment on the ground that without these opinions, Bolt has failed to provide sufficient evidence to support all elements of his claims. (Doc. 46).

After Ford moved to exclude Webb's expert opinions, Bolt filed a notice withdrawing his designation of Webb as an expert witness. (Doc. 49; *see also* Doc. 51 at 14 n.12; Doc. 55; Doc. 56). Because Bolt will not rely on Webb's opinions to support his claims, Ford's motions to exclude those opinions (Docs. 44 & 45) are due to be denied without prejudice as moot. Moreover, in his response to Ford's motion for summary judgment, Bolt states he does not oppose entry of summary judgment in Ford's favor on his negligent failure to warn, wanton failure to warn, and breach of implied warranty claims. (Doc. 51 at 12 n.7). Accordingly, those claims are deemed abandoned, and Ford's motion for summary judgment is due to be granted with respect to the abandoned claims. *See Powell v. American Remediation & Envtl., Inc.*, 61 F. Supp. 3d 1244, 1252 n.9 (S.D. Ala. 2014) (noting that while a district court must ensure summary judgment is proper where party wholly fails to respond to motion, it may consider a particular claim abandoned where non-moving party fails to address that claim but does address others), *aff'd*, 618 F. App'x 974 (11th Cir. 2015). Ford's motions to exclude the expert opinions

of Dr. Dunn and Miller have been fully briefed (Docs. 41, 43, 57-1, 57-2, 61, 62),[5] as has Ford's motion for summary judgment with respect to Bolt's AEMLD, negligence, and wantonness claims (Docs. 47, 51, 60).

A basic understanding of the throttle control system in a 2002 Ford Taurus provides context for the expert opinions of Dr. Dunn and Miller. Because the expert opinions of Dr. Dunn and Miller reference an investigation conducted by the Office of Defects Investigation (the "ODI") within the U.S. Department of Transportation's National Highway Traffic Safety Administration identified as Preliminary Evaluation 12-033 ("PE12-033"), as well as an initiative Ford implemented following the investigation identified as Customer Satisfaction Program 13B04, an overview of the investigation and program will also precede a discussion of the expert opinions.

## A. Throttle Control System

The throttle control system in a 2002 Ford Taurus is comprised in relevant part of an accelerator cable and a speed control cable connected to a throttle body. When the accelerator pedal is pressed, the accelerator cable is pulled and opens the throttle body plate, allowing the engine to generate speed and torque. When the

---

[5] After filing his responses to Ford's motion to exclude the expert opinions of Dr. Dunn and Miller (Docs. 53 & 53), Bolt filed amended responses (Docs. 57-1 & 57-2) to comply with the applicable page limitation.

accelerator pedal is released, two springs close the throttle body plate and return the engine to idle.

The speed control cable is part of what is sometimes referred to as the cruise control system. When the speed control system is activated, a servo pulls on the speed control cable, which is connected to the throttle body plate by a lost motion device. One end of the speed control cable is bound by a ferrule that is secured within the speed control cable retention collar by two tabs. The retention collar, made of the polymer Nylon 66, is mounted to a bracket near the throttle body.[6]

**B. PE12-033 & Customer Satisfaction Program 13B04**

The ODI opened the investigation identified as PE12-033 in October 2012 to address the concern a fractured speed control cable retention collar in certain 2000-2003 model year Ford Taurus vehicles could result in a stuck throttle condition. (Doc. 48-16 at 2).

Ford undertook testing in response to the investigation. In a January 2013 response to the ODI, Ford stated that while it identified chemical exposure from battery venting as a likely cause of crazing on speed control cable retention collars, it concluded crazing was unlikely to cause collars to fracture under normal operating conditions. (Doc. 48-10 at 2, 16, 25, 27). Instead, it concluded collar

---

[6] This explanation of the throttle control system is derived from Ford's brief in support of its summary judgment motion (Doc. 47 at 5-6) and the ODI's closing resume for PE12-033 (Doc. 48-16 at 2).

fractures were likely caused by improperly performed service procedures. (*Id.* at 2, 20, 25, 27).

Ford further stated it believed the throttle body plate must first be greater than 29% open before a fractured collar could prevent the throttle from returning to idle. (*Id.* at 21). It found that manually positioning a speed control cable ferrule on the edge of a broken speed control cable retention collar resulted in a throttle body plate opening of approximately 29% and that a vehicle with a throttle body plate stuck at 29% open, travelling at a speed up to 70 miles per hour, remained controllable and could be safely brought to a complete stop with a single application of the brakes and even after multiple brake applications diminished vacuum assist. (*Id.* at 2, 23-25, 27).

Ford implemented Customer Satisfaction Program 13B04 in June 2013. (Doc. 48-3 at 2; Doc. 48-7 at 2; Doc. 48-16 at 2). The notice Ford sent to dealers and owners of affected vehicles stated the speed control cable in certain Taurus vehicles "may be susceptible to damage or becoming partially disconnected during under hood vehicle maintenance (e.g., replacing a battery or changing the air filter)," and that a damaged speed control cable "could interfere with the throttle's full return to idle when the accelerator pedal is released, potentially resulting in an

elevated idle." (Doc. 48-3 at 2; Doc. 48-7 at 2, 7).[7] To address this concern, Ford instructed dealers to (1) "[r]emove the two pin-type retainers and the accelerator control splash shield," (2) inspect the speed control cable retention collar for cracked or missing "retention tabs," (3) replace the speed control cable if either retention tab is missing, but not if the tabs are merely cracked, (4) install a "collar reinforcement clip" onto the speed control cable regardless of the state of the collar, and lastly, (5) "[i]nstall the accelerator control splash shield and the two pin-type retainers." (Doc. 48-7 at 2, 7-8). Ford noted the clip "adds robustness to the collar's retaining feature and prevents the cable from sliding out of the collar." (*Id.* at 2, 7).

Also in June 2013, the ODI closed PE12-033. (Doc. 48-16 at 2, 4). In its closing resume, the ODI summarized the issue as follows:

> The failure mode of the cable assembly is associated with the plastic collar used to secure the cable to a bracket near the throttle body []. Damage to one or both retention tabs used to secure the cable ferrule within the collar may allow the ferrule to become disconnected from the collar when the throttle is opened during accelerator pedal application. . . . If the displacement pulls the ferrule completely out of the collar, the ferrule end may contact the face of the collar when the accelerator pedal is released and the throttle is returning to idle []. This results in a throttle stuck at approximately 26-29% open. Testing conducted at [National Highway Traffic Safety Administration's] Vehicle Research and Test Center found that brake booster vacuum

[7] Ford sent this notice to Bolt in July 2013. (Doc. 48-3 at 2). Bolt found the letter in a pile of mail in July or August 2014. (Doc. 48-2 at 44).

may become depleted, resulting in reduced brake effectiveness, if the brake is applied repeatedly when the throttle is stuck at this position.

(*Id.* at 2). It noted Ford's conclusion that collar fractures were likely caused by improperly performed service procedures, not a defect in the speed control cable, as well as Ford's initiation of Customer Satisfaction Program 13B04. (*Id.* at 2, 4).

### C. Dr. Dunn's Expert Opinions

Dr. Dunn is a chemical engineer. In his expert report, he stated his initial, visual inspection of the vehicle revealed the speed control cable retention collar was fractured. (Doc. 48-8 at 7). Based on this visual inspection, a microscopic examination, and Fourier Transform Infrared Spectroscopy testing, Dr. Dunn reached the opinion sulfuric acid from the vehicle's battery caused the collar to craze, then crack, and eventually resulted in a brittle fracture some time before the crash. (*Id.* at 11-12). He identified the addition of the collar reinforcement clip implemented as part of Customer Satisfaction Program 13B04 as an alternative design that would improve retaining collar strength and provide splash protection from chemicals. (*Id.* at 12).

When deposed, Dr. Dunn explained he identified the addition of the collar reinforcement clip as a superior alternative design by "accepting Ford's alternative design." (Doc. 48-5 at 6). He referred to the alternative design both as a clip and a splash guard. (*See, e.g., id.* at 6, 44). In explaining why he used the latter term, he explained Ford called the alternative design a splash guard, pointing to Ford's

instructions for dealers regarding Customer Satisfaction Program 13B04 –
specifically to the instruction to "[i]nstall the accelerator control splash shield."
(*Id.* at 44). According to Dr. Dunn, the splash shield was for the reinforcement
clip. (*Id.*).

### D. Miller's Expert Opinion

Miller is an automotive mechanic. (Doc. 48-14 at 2). In his expert report,
he stated his initial visual inspection of the vehicle revealed the speed control cable
ferrule had pulled out of the fractured retention collar and become displaced. (*Id.*
at 3). He further stated the throttle body plate was open 25-30%, and that his
observation of slack in the accelerator cable allowed him to rule out this cable as
the cause of the throttle body plate being open. (*Id.*).

Miller conducted testing on another 2002 Ford Taurus (the "exemplar
vehicle") to determine the effect of a broken speed control cable retention collar on
a vehicle's throttle and brake systems. (*Id.* at 4). In his expert report, Miller stated
the speed control cable retention collar on the exemplar vehicle was cracked, but
the cable was not displaced from the collar. (*Id.*). Using a scan tool, Miller
determined the throttle body plate was open 18% at idle. (*Id.*). Miller pulled the
cable out of the cracked collar to determine the position of the throttle plate when
the cable was lodged against the collar – 37% open. (*Id.*). Miller then removed a
piece of the cracked collar to determine the position of the throttle body plate when

the cable was lodged against the collar – 29% open. (*Id.*). Miller determined the vehicle would maintain 74 miles per hour with the throttle body plate open 29% and that the brake system's vacuum assist could be depleted by pumping the brakes with the throttle body plate open at either 29% or 37%. (*Id.*).

Miller noted the results of his inspection of the speed control cable on Bolt's vehicle were consistent with the findings of PE12-033 and that his testing of the exemplar vehicle yielded findings consistent with PE12-033. (*Id.* at 4-5). Ultimately, he opined the displaced cable in Bolt's vehicle held the throttle body plate partially open, resulting in the excessive engine speed and loss of braking ability that caused Bolt to lose control of the vehicle and crash into a tree. (*Id.* at 5).

Miller clarified the findings and opinions stated in his expert report during his deposition and in a subsequent affidavit. He did not actually observe the throttle body plate to be partially open because to do so would have required him to remove other components of the vehicle and risk spoliating evidence. (Doc. 48-13 at 34, 55). His observation of slack in the accelerator, of the idle stop position, and of the position of the throttle arm indicated the throttle body plate was open. (*Id.* at 33-35, 78). Moreover, as he found it upon initial visual inspection, the speed control cable was partially in the retention collar and the throttle body plate appeared to be open 19-20%, slightly above idle. (*Id.* at 55, 78). When the

accelerator pedal was pressed, the speed control cable migrated out of the retention collar and became hung on the lip of the collar. (*Id.* at 55, 78). Based on measurements of the throttle arm taken at this point, Miller concluded the throttle body plate was open 25-30% with the speed control cable hung on the lip of the retention collar. (*Id.* at 78; Doc. 52-10 at 4). Finally, Miller clarified he determined the exemplar vehicle would maintain 74 miles per hour with the throttle plate open 29% by driving the vehicle on Interstate 59. (Doc. 48-13 at 70).

Miller testified he did not know the speed at which Bolt was travelling up the inclined portion of Henry Road or the grade of that portion of the road. (Doc. 48-13 at 46). He further testified he did not know how far open the throttle body plate needed to be for Bolt to travel up the inclined portion of Henry Road at 55 miles per hour and that he could not say whether the throttle body plate would have to be open more than 29%. (*Id.* at 31, 46). He indicated these were questions for an accident reconstructionist. (*Id.* at 46-47). Finally, he testified the throttle body plate would have to be open at least 29% for the speed control cable to migrate out of the retention collar and become hung on the lip of the collar. (*Id.* at 47).

## II. Discussion

### A. Motions to Exclude

#### 1. Standard of Review

Rule 702 of the *Federal Rules of Evidence* governs the admission of expert testimony. It was amended in 2000 in response to *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, (1993), and the cases applying *Daubert*, including *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137 (1990). *See* FED. R. EVID. 702 advisory committee's note to 2000 amendment. In *Daubert*, the Supreme Court held a trial court must ensure scientific expert testimony is both reliable and relevant. 509 U.S. at 589-95. In *Kumho Tire*, the Supreme Court held the "gatekeeping" obligation imposed on trial courts by *Daubert* applies not only to testimony based on scientific knowledge, but also to testimony based on technical and other specialized knowledge. 526 U.S. at 141. In its current version, Rule 702 provides:

> [a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

FED. R. EVID. 702. To fulfill its gatekeeping obligation under *Daubert*, a trial court must undertake a "rigorous inquiry" to determine whether:

> (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.

*Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1291-92 (11th Cir. 2005) (internal quotation marks omitted). The party offering the expert testimony has the burden of proving each of the foregoing elements by a preponderance of the evidence. *Id.* at 1292.

In assessing the reliability of expert testimony, a court may consider whether the methodology employed by the expert (1) can be tested, (2) has been subjected to peer review, (3) has a known or potential rate of error, and (4) is generally accepted by the relevant expert community. *Daubert*, 509 U.S. at 593-94. "These factors are illustrative, not exhaustive; not all of them will apply in every case, and in some cases other factors will be equally important in evaluating the reliability of proffered expert opinion." *United States v. Frazier*, 387 F.3d 1244, 1262 (11th Cir. 2004). A court has " 'substantial discretion in deciding how to test an expert's reliability . . . .'" *Rink*, 400 F.3d at 1292 (quoting *United States v. Majors*, 196 F.3d 1206, 1215 (11th Cir. 1999)).

Ultimately, the court must be mindful to focus its inquiry on the methodology employed by an expert to reach his or her opinions, rather than on the

opinions themselves. *Daubert*, 509 U.S. at 594-95. "[I]t is not the role of the district court to make ultimate conclusions as to the persusasiveness of the proferred evidence." *Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd.*, 326 F.3d 1333, 1341 (11th Cir. 2003). That is for the jury. *See id.*

## 2. Expert Opinions of Dr. Dunn

Dr. Dunn concluded sulfuric acid from the vehicle's battery caused the speed control cable retention collar to craze, then crack, and eventually resulted in a brittle fracture sometime before the crash. (Doc. 48-8 at 11-12). He then identified the addition of the collar reinforcement clip Ford implemented as part of Customer Satisfaction Program 13B04 as an alternative design that would have protected against the collar's exposure to chemical attack. (*Id.* at 12). He reached the conclusion the addition of the clip was a superior alternative design because he believed Ford had implemented use of the clip in part to provide splash protection. (Doc. 48-5 at 6, 44; Doc. 48-8 at 12). He did not test the clip's ability to protect the speed control cable retention collar from exposure to battery acid and provides no other basis for his conclusion.

The flaw in Dr. Dunn's reliance is there is no evidence Ford implemented use of the clip to protect the speed control cable retention collar from exposure to battery acid. In connection with PE12-033, Ford concluded improperly performed service procedures, rather than crazing caused by chemical exposure from battery

venting, likely accounted for collar fractures, and the notice Ford sent to owners of affected vehicles indicated the collar reinforcement clip was designed to address that concern. (Doc. 48-3 at 2; Doc. 48-10 at 2, 16, 20, 25, 27). The notice Ford sent to dealers additionally noted the clip makes the collar's retaining feature more robust and prevents the speed control cable from sliding out of the collar. (Doc. 48-7 at 2, 7). The notices do not suggest the clip was designed to protect the collar from chemical exposure.

Moreover, Dr. Dunn is mistaken that Ford refers to the clip as a splash guard in its instructions for dealers regarding Customer Satisfaction Program 13B04. Consideration of those instructions as a whole makes clear the "accelerator control splash shield" is a component of the vehicle a dealer removes before, and then re-installs after, inspecting the speed control cable retention collar and installing the collar reinforcement clip. (Doc. 48-7 at 7-8). The collar reinforcement clip and accelerator control splash shield are not different names for the same part; they are different names for different parts, and the latter part is not one added to the vehicle as part of Customer Satisfaction Program 13B04 but, rather, is already installed in the vehicle. "It is clear that a court may exclude expert testimony that is predicated upon a mistake of fact." *United States ex rel. Tennessee Valley Auth. v. An Easment & Right-of-Way Over 4.95 Acres of Land, More or Less, in Madison Cty., Alabama*, 2015 WL 2194598, at *2 (N.D. Ala. May 11, 2015) (excluding

expert testimony based on mistake of fact); *cf. Dowdy v. Suzuki Motor Corp.*, 567 F. App'x 890, 892-93 (11th Cir. 2014) (affirming summary judgment where plaintiff's theory of causation depended on expert testimony accident was caused by joint becoming wedged in motorcycle's swing arm assembly tube, which in turn depended on expert's mistaken belief tube was oval, not round).

Even if Ford had referred to the collar reinforcement clip as a splash guard, this mere, nominal reference is not a sufficient basis for Dr. Dunn's conclusion the clip is an alternative design that would have protected against the speed control cable retention collar's exposure to chemical attack. It amounts to nothing more than speculation that calling a clip a splash guard means Ford intended the clip to protect the collar from chemical exposure caused by battery venting, even after concluding such exposure was unlikely to cause a collar fracture. Speculation is not a reliable basis for an expert opinion. *See Kilpatrick v. Breg, Inc.*, 613 F.3d 1329, 1335 (11th Cir. 2010) (noting *Daubert* requires trial courts to act as "gatekeepers" to ensure speculative, unreliable expert testimony does not reach jury).

To the extent Bolt would argue the collar reinforcement clip protects against the same ultimate risk – that the speed control cable will become dislodged from a fractured retention collar – the argument does not save Dr. Dunn's alternative design opinion. First, Dr. Dunn did not offer this explanation, and the *Daubert*

inquiry scrutinizes the methodology by which an expert witness reaches his conclusions. *See Daubert*, 509 U.S. at 594-95. Second, without consideration of (1) whether the cause of a collar fracture – an impact during an improperly performed service procedure or exposure to battery acid – affects the clip's efficacy at keeping a cable from sliding out of the collar or (2) the material of which the clip is made and whether that material is susceptible to damage from exposure to battery acid that risks failure of the clip itself, an explanation why the clip is a superior alternative design with respect to the specific defect at issue would be lacking. *See Rink*, 400 F.3d at 1292 (holding transposition of temperature data from one site where chemicals were stored to another based on conjecture storage conditions were similar and sites were all in same basic latitudinal range lacked the "intellectual rigor" required by *Daubert*).

Ultimately, Dr. Dunn's opinion regarding an alternative design relies on a mistake of fact and lacks support in the way of testing, analysis, or other explanation. Without grounding in a reliable methodology, it must be excluded. *See Slay v. Keller Indus., Inc.*, 823 So. 2d 623, 626 (Ala. 2001) (excluding expert opinion regarding alternative design because "bald assertion" without supporting research, testing, or experiments, even if asserted by mechanical engineer generally qualified to speak expertly on such matters, cannot qualify as proper under either the "general-acceptance" standard enunciated in *Frye v. United States*, 293 F. 1013

(D.C. Cir. 1923), or the "scientifically reliable" standard of *Daubert*); *McCreless v. Global Upholstery Co., Inc.*, 500 F. Supp. 2d 1350, 1357-58 (N.D. Ala. 2007) (excluding expert opinion regarding alternative design where court could detect no methods or procedures employed to formulate opinion); *Borum v. Werner Co.*, 2012 WL 2047678, at \*13 (N.D. Ala. June 6, 2012) (excluding expert opinion regarding alternative design that lacked support, analysis, or testing).[8]

### 3. Expert Opinions of Charlie Miller

Miller's opinion is that the speed control cable on Bolt's vehicle migrated out of the fractured speed control cable retention collar, got hung on the lip of the collar, and held the throttle body plate open 25-30%, resulting in the excessive engine speed and loss of braking ability that caused Bolt to lose control of the vehicle and crash into a tree. (Doc. 48-14 at 3-5; Doc. 48-13 at 33-35, 55, 78; Doc. 52-10 at 4).

Miller did not find Bolt's vehicle with the speed control cable fully displaced from and hung on the lip of the retention collar or the throttle body plate open 25-30%. (Doc. 48-13 at 34, 55). He found it with the speed control cable

---

[8] Because Dr. Dunn's opinion regarding an alternative design is due to be excluded on reliability grounds and Bolt cannot maintain his claims without this opinion, the undersigned declines to address Ford's arguments that Dr. Dunn's opinion that sulfuric acid from the vehicle's battery caused the collar to craze, then crack, and eventually resulted in a brittle fracture sometime before the crash should be excluded and that Dr. Dunn is not qualified to offer a defect design opinion. To the extent it is unnecessary to address these arguments, Ford's motion to exclude the expert opinions of Dr. Dunn is due to be denied as moot.

partially in the retention collar and the throttle body plate open 19-20%, slightly above idle. (*Id.* at 55, 78). By pressing the accelerator pedal on Bolt's vehicle with unspecified force while the vehicle was parked, he demonstrated it was possible for the speed control cable to become hung on the lip of the retention collar and hold the throttle body plate open 25-30%. (*Id.*; Doc. 52-10 at 4). He also demonstrated it was possible to recreate this condition in an exemplar vehicle and noted the condition he was able to demonstrate in Bolt's vehicle and recreate in the exemplar vehicle were consistent with the condition addressed in PE12-033. (Doc. 48-14 at 4-5). However, his conclusion the condition manifested in Bolt's vehicle at the time of the accident and caused Bolt to lose control of the vehicle, crashing into a tree, lacks a sufficient factual basis.

Miller testified the throttle body plate would have to be open at least 29% for the speed control cable to come out of the retention collar and become hung on the collar lip. (Doc. 48-13 at 47). This testimony echoes Ford's finding that the throttle body plate must first be greater than 29% open before a fractured collar could prevent the throttle from returning to idle. (Doc. 48-10 at 21). Accordingly, a conclusion the speed control cable in Bolt's vehicle came out of the retention collar and became hung on the collar lip would require consideration of how far the throttle body plate was open as Bolt accelerated up Henry Road, which in turn would require consideration of Bolt's rate of speed and the road grade. Miller

testified he did not know either of these variables, nor could he answer hypothetical questions regarding the position of the throttle body plate. (Doc. 48-13 at 31, 46). He testified these were questions for an accident reconstructionist. (*Id.* at 46-47).[9]

Absent consideration of the force with which Bolt was pressing the accelerator pedal immediately preceding the accident sequence, Bolt's rate of speed as he travelled up the inclined portion of Henry Road, or the grade of that portion of the road, Miller's opinion is speculative and must be excluded. *See Kilpatrick*, 613 F.3d at 1335 (noting *Daubert* requires trial courts to act as "gatekeepers" to ensure speculative, unreliable expert testimony does not reach jury); *Prall v. Ford Motor Co.*, 2017 WL 361545, at *3-4 (D. Nev. Jan. 24, 2017) (excluding expert witness' opinion a defective speed control cable caused plaintiff's 2003 Ford Taurus to accelerate unintendedly where expert was able to slide cable in and out of collar with no resistance, but could not determine that cable slid out of collar at time of accident, and otherwise failed to provide sufficient basis for his conclusion that was beyond the understanding of a lay person).

---

[9] Webb was Bolt's accident reconstruction expert. (*See* Doc. 48-21).

**B. Motion for Summary Judgment**

**1. Standard of Review**

Under Rule 56 of the Federal Rules of Civil Procedure, "[t]he [district] court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). The party seeking summary judgment bears the initial burden of informing the district court of the basis for its motion and identifying those portions of the record the party believes demonstrate the absence of a genuine dispute as to a material fact. *Celotex Corp.*, 477 U.S. at 323. If the moving party carries its initial burden, the non-movant must go beyond the pleadings and come forward with evidence showing there is a genuine dispute as to a material fact for trial. *Id.* at 324.

The substantive law identifies which facts are material and which are irrelevant. *Anderson*, 477 U.S. at 248. A dispute is genuine if the evidence is such that a reasonable jury could return a verdict for the non-movant. *Id.* at 248. All reasonable doubts about the facts should be resolved in favor of the non-movant, and all justifiable inferences should be drawn in the non-movant's favor. *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993).

## 2. AEMLD, Negligence, & Wantonness Claims

Negligence and wantonness claims based on product defects and AEMLD claims are distinct causes of action. *Tillman v. R.J. Reynolds Tobacco Co.*, 871 So. 2d 28, 34-35 (Ala. 2003) (holding the judicially-created AEMLD does not subsume the common-law tort claims of negligence and wantonness). Nonetheless, they share some common elements. *McMahon v. Yamaha Motor Corp., U.S.A.*, 95 So. 3d 769, 772 (Ala. 2012) (as to AEMLD and negligence claims). Each type of claim requires proof of a defective product and proof the defect caused the plaintiff's injury. *McMahon*, 95 So. 3d at 772 (AEMLD and negligence claims both require proof of defective product); *Verchot v. General Motors Corp.*, 812 So. 2d 296, 301 (Ala. 2001) (AEMLD claim requires proof defect caused injury); *Yamaha Motor Co., Ltd. v. Thornton*, 579 So. 2d 619, 623 (Ala. 1991) (negligence claim based on product defect requires proof of proximate cause); *Lemley v. Wilson*, 178 So. 3d 834, 842 (Ala. 2015) (proximate cause is an essential element of both negligence claims and wantonness claims generally).

A defective product is one that "does not meet the reasonable expectations of an ordinary consumer as to its safety." *Casrell v. Altec Indus., Inc.*, 335 So. 2d 128, 133 (Ala. 1976). Otherwise put, a defect is "that which renders a product 'unreasonably dangerous,' i.e., not fit for its intended purpose . . . ." *Id.* To prove a design defect giving rise to liability under the AEMLD, a plaintiff must show "a

safer, practical, alternative design was available to the manufacturer at the time it manufactured the [product]." *General Motors Corp. v. Jernigan*, 883 So. 2d 646, 662 (Ala. 2003) (internal quotations marks omitted) (alteration in original). Likewise, negligence and wantonness claims based on design defects require proof of a safer, practical, alternative design. *Connally v. Sears, Roebuck & Co.*, 86 F. Supp. 2d 1133, 1137-38 (S.D. Ala. 1999). Expert testimony is usually required to prove a product defect because of the "complex and technical nature of the commodity." *Brooks v. Colonial Chevrolet-Buick, Inc.*, 579 So. 2d 1328, 1332-33 (Ala. 1991) (holding expert testimony was required to prove design defect in brake system).

Apart from Dr. Dunn's opinion regarding the addition of the collar reinforcement clip implemented as part of Customer Satisfaction Program 13B04, which must be excluded, Bolt offers no evidence of a safer, practical, alternative design. Moreover, absent Miller's excluded opinion a struck throttle condition caused the accident, Bolt offers no evidence the allegedly defective retention collar caused the accident. Bolt having failed to produce evidence to support essential elements of his AEMLD, negligence, and wantonness claims, Ford's motion for summary judgment on these claims is due to be granted. *See Phillips v. American Honda Motor Co., Inc.*, 238 F. App'x 537, 542-43 (11th Cir. 2007) (holding district court did not abuse its discretion in excluding expert witness' testimony

regarding product defect and safer, practical, alternative design because methodology underlying testimony was unreliable, and that without evidence of alternative design, district court properly granted summary judgment on AEMLD claim); *Connally*, 86 F. Supp. 2d at 1140 (granting summary judgment on AEMLD, negligence, and wantonness claims where plaintiffs failed to offer evidence of safer, practical, alternative design); *Dowdy*, 567 F. App'x at 893 (holding district court properly granted summary judgment on AEMLD claim where plaintiff did not present sufficient evidence design defect was cause-in-fact of plaintiff's motorcycle accident).

## III. Conclusion

For the foregoing reasons, Ford's (1) motion to exclude the expert opinions of Dr. Dunn (Doc. 40) is due to be granted in part and denied in part as moot, (2) motion to exclude the expert opinion of Miller (Doc. 42) is due to be granted, (3) motions to exclude the expert opinions of Webb (Docs. 44 & 45) are due to be denied as moot, and (4) motion for summary judgment (Doc. 46) is due to be granted.

**DONE** this 19th day of March, 2019.

Staci G. Cornelius

STACI G. CORNELIUS
U.S. MAGISTRATE JUDGE